Richard S. Heller, J.
The claim as filed seeks recovery of four separate items based upon a contract between claimants and the State, entered into on or about August 2, 1950, for the reconstruction of an interstate bridge over the Delaware River between the borough of Damascus, Pennsylvania, and the town of Cochecton, New York.
The State has interposed a defense to all of the items included in this claim based upon an assertion of the contract clause providing that acceptance of a final payment operates as a release of any further claims arising under the contract.
Whether the acceptance of an undisputed balance due under a contract containing this standard provision used by the Department of Public Works constitutes acceptance of a final payment effecting a release of any further claims, is a question of fact. (Fredburn Constr. Corp. v. City of New York, 280 N. Y. 402; Podzuweit v. State of New York, 192 Misc. 528.)
Work under the contract was completed on January 9, 1952 and accepted by the State on April 3, 1952. Both prior and *785 subsequent to those dates a controversy concerning an alleged variation between the contract and the work required to be performed relating to Cast-in-Place concrete piles was known to the State. On January 16, 1953 the State forwarded to the claimants the final estimate and final agreement showing a balance due under the contract in the amount of $27,601.44. Claimants refused to execute this final agreement and on March 26,1953 filed this claim in this court.
Thereafter claimants were advised by their attorneys that a motion was being made to sever one item seeking recovery of $27,601.44, the admitted balance due, from the other items in accordance with a practice which has come to be utilized in such cases as this since the State’s adoption of the clause making acceptance of a final payment a release. (See Rusciano & Son Corp. v. State of New York, 201 Misc. 690, affd. 281 App. Div. 733.) Claimants were advised that the motion papers for a severance had been forwarded to the Attorney-General.
About July 1, 1953 the claimants received a check drawn by the Treasury Department of the Commonwealth of Pennsylvania in the amount of $14,662.49. Claimants accepted this check and applied it to the admitted balance due under the contract. Thereafter claimants were advised by their attorneys that the office of the Attorney-General of the State of New York was attempting to fix a date for the trial of this item of the claim and in the early part of August, 1953 claimants were advised by their attorneys that the State was considering a motion for dismissal of the claim on the ground that this court had no jurisdiction since the contract involved the Interstate Bridge Authority of the States of New York and Pennsylvania.
On July 21, 1953 an assistant attorney-general wrote to the attorneys for the claimants concerning a return date for two motions without designating the nature of the motions and the return date was indicated to be August 31, 1953.
Claimants were subsequently advised by their attorneys that about August 3, 1953 there had been a consultation with an assistant attorney-general concerning a date for trial pursuant to the motion for severance and that the assistant attorney-general had indicated that the State would make returnable at the same time a motion to dismiss the claim on the ground of lack of jurisdiction. Claimants ’ attorneys also report that the assistant attorney-general had advised that he would see whether or not payment of the admitted balance due could be made without the severance motion and a trial thereafter in order to avoid any involvement of the question of the jurisdiction of this court with the undisputed balance due. On or about August 19, 1953 *786 claimants received and accepted a check from the State of New York in the amount of $12,938.95.
The checks from the Commonwealth of Pennsylvania and the State of New York totaled the undisputed balance due of $27,601.44. Neither check bore any kind of notation or designation as to the nature of the payment.
It does not appear from the record as to what disposition, if any, was ever made of the motion for severance. The motion for dismissal on the ground of lack of jurisdiction was argued and this court denied the motion to dismiss, which decision was thereafter affirmed by the Appellate Division. (D’Angelo v. State of New York, 206 Misc. 1007, affd. 285 App. Div. 29.)
The claimants did not regard the two checks as a final payment for in each instance claimants wrote to the authority drawing the check that the amounts thereof were being applied against the undisputed balance due but were not considered by claimants as a release of other claims under the contract. This action by the claimants could not change the nature of the two checks, if those checks actually were intended to and did constitute a final payment under the contract since this would be a unilateral effort to modify the contract. (Buffalo Elec. Co. v. State of New York, 4 Misc 2d 172.)
There was here however, much more than a unilateral action by the claimants. The claimants had refused to execute the final agreement. They had already invoked the jurisdiction of this court and they had taken steps to obtain prompt payment of the undisputed balance due in accordance with a procedure permitted by this court.
The State was aware of all these steps and had started its own procedure seeking a dismissal of the claim upon grounds of lack of jurisdiction. Under these circumstances the two checks accepted by the claimants could not constitute a final payment within the meaning of the contract so as to constitute a bar to the prosecution of the claim which claimants had already filed in this court.
It is doubtful that this payment could have constituted a final payment under the contract under any circumstances. A final payment is described in the contract as one made by the Comptroller who is defined in the contract as the head of the New York State Department of Audit and Control, on the basis of a final estimate prepared and approved by the district engineer. The Comptroller is to pay the amount shown to be due on that final estimate less any deductions authorized to be made by the Comptroller. Under the contract here there was no such payment by the Comptroller.
*787 As was pointed out in D’Angelo v. State of New York (285 App. Div. 29, supra), this was a contract between claimants and the State of New York and the primary obligation under the contract rested upon the State of New York. The effect of the approval by the Interstate Bridge Commission and the execution of the contract by the Commonwealth of Pennsylvania did not make either of those a party to the contract so as to vary or modify the contractual description of a final payment. While periodic payments for work done were paid by both the State of New York and the Commonwealth of Pennsylvania and accepted by the claimants, there is no such description in the contract of periodic payments as relates to the final payment.
The court finds that the claimants are not barred from pursuing this claim by the acceptance of the two checks in the total amount of $27,601.44.
Since the one item of the claim in the amount of $27,601.44 has been received by the claimants, there is nothing for this court to determine in regard to that claim except the question of interest thereon. Another item of the claim relating to a dry masonry wall was dismissed by the court at the close of the trial and needs no further consideration here. The remaining items of the claim relate to contract provisions providing for Cast-in-Place concrete piles.
Claimants contend that they suffered damage in the amount of $31,019.17 resulting from a loss of profit anticipated in the driving of 5,642 linear feet of piles provided for under the contract and the increased cost of driving 11,093 linear feet which included additional costs by reason of the driving of certain piles utilized in the structure and termed by the claimants “ test piles ” and by the State “ recorded piles ”.
The State contends that the contract did not provide for the driving of a minimum of 16,735 linear feet of piles but that even if it did the State was not liable for any breach of contract or loss of anticipated profits by limiting the driving of piles to 11,093 linear feet since the contract contained a provision for changes or alterations in the plans or omission of work without liability. Finally the State contends that claimants have failed to establish any damages by reason of driving less than 16,735 linear feet of piles.
The first problem presented by these contentions is the meaning of the contract. In the bid proposal there was a listing of 17,500 linear feet of Oast-in-Place concrete piles which are known as Item 850 under the Public Works specifications of January 2, 1947, which formed a part of the bid proposal and the contract. The specifications contained in 850 provide that *788 lengths of piles on plans are for estimating purposes only and that actual lengths of piles necessary will be determined in the field by driving the shells to the resistance required by the engineer. By reference to the specifications for Item 84T, it is also provided that when required, the lengths and number of piles will be determined by actual loading tests and that all piles shall be driven to the elevations shown on the plans, or to the resistance ordered by the deputy chief engineer.
On the plans for this particular work which constituted a part of the contract, there appeared on Sheet 6 which was a plan and profile, a note reading: “ The Contractor’s attention is directed to the special notes for this structure which appear in the proposal. Particular attention should be given to the foundation note, which briefly outlines the anticipated subsurface conditions at the site of the structure and which specifies certain requirements relative to construction.”
Sheet 8 of the plans contains a pile plan for piers 1 and 2 and notes that the estimated length for the piles in pier 1 was 35 feet and the estimated length for the piles in pier 2 was 45 feet. On Sheet 9 there is a pile plan for the north abutment on which the estimated length for the piles is given as 55 feet. On Sheet 10 there is a pile plan for the south abutment and the estimated length for the piles is given as 25 feet. With each estimated length there appears a statement that ‘ ‘ For design purposes the assumed load does not exceed 30 tons per pile.” On Sheet 11 of the plans there appears a table headed “Total Estimate of Quantities” and under Item 85C there appears a provision for 16,735 linear feet under the heading “ neat” and 17,500 linear feet under the heading “ bounded ”.
The proposal contained the “ Special Bridge Notes ” referred to in the note on Sheet 6 of the plans. This provision in the proposal was in part a standard form, apparently utilized on every Department of Public Works bridge contract but it also contained three paragraphs relating specifically to this contract. These paragraphs read as follows:
“It is planned to support the abutments and piers of this bridge on cast-in-place concrete piles driven thru sand, silt and clay strata to the required resistance. The piles driven at the south abutment shall be at least 25' long and at pier No. 1 shall be at least 35' long; at pier No. 2, at least 45' long and at the north abutment, at least 55' long. Where required resistance is not obtained at the minimum length designated, the driving shall be continued until the resistance is obtained.
“ An item of cofferdams has been provided in the contract so that the excavation and masonry work can be done in the dry. *789 In order to establish the minimum length of piles indicated on the plans, in the finished structure, it may be necessary to resort to jetting or other operations as directed by the Deputy Chief Engineer, (B.G.S. and S.). All costs of such operations shall be included in the unit price bid for the item of cast-in-place concrete piles.
“ It will be the Contractor’s obligation and responsibility to use methods and equipment which will insure completion of the work with a minimum of delay.”
The State contends that under these various provisions relating to Cast-in-Place concrete piles the determining factor of length was the “ required resistance ” which in practice is determined by measuring the number of blows per minute necessary to drive a pile a designated distance and that this is determined on every job by actually counting the number of blows in the process of driving.
The claimants contend that the effect of the “ Special Bridge Notes ” was to establish minimum lengths for piles in each foundation structure with the provision that if required resistance was not obtained at those minimum lengths, driving had to be continued until the required resistance for a 30-ton load was reached.
The provisions of this contract permit of no other construction than that urged by the claimants. The State’s choice of words required the contractor to drive piles to minimum lengths regardless of resistance met and further than those lengths if the resistance at such lengths was insufficient.
The “ Special Bridge Notes ” establishing minimum lengths of piles at the various foundation structures took precedence over the general provisions of the Public Works specifications applicable to all contracts and the general terms of the uniform contract form. (Pallette v. State of New York, 266 App. Div. 490, affd. 292 N. Y. 657; Young Fehlaber Pile Co. v. State of New York, 265 App. Div. 61.) The plans themselves directed attention to the “ Special Bridge Notes ” and thus modified the use of the word “ estimated ” in connection with lengths shown on the plans. On this record the warning to the contractor that “ jetting or other operations ” might be necessary in order to establish the “ minimum length of piles ” indicated that the State contemplated that the required resistance for a 30-ton load might be reached at less than the minimum lengths designated.
In entering into this contract the State contracted for and the contractor agreed to drive a minimum of 16,735 linear feet of Cast-in-Place concrete piles. Unless the action of the State *790 in ordering shorter lengths was proper and in accordance with the State’s reservation of a right “ to alter the plans or omit any portion of the work as it may deem reasonably necessary for the public interest ” without giving rise to liability, the action of the State constituted a breach of the contract.
The purpose of this clause was described in Kinser Constr. Co. v. State of New York (204 N. Y. 381, 391) as: “On the one hand, it protects the contractor from arbitrary, capricious or unreasonable action by public officers, and on the other it protects the state from unforeseen conditions, which would render the work as originally planned impossible of performance.”
Here the State made borings at the site which were available to the claimants, drew the plans and wrote the contract and in so doing made a specific requirement that the piles were to be driven to certain minimum lengths. Its sole basis for ordering driving to less than the minimum lengths was that required resistance had been met at less than the minimum lengths and it was not necessary to drive further than the required resistance.
According to the State this was in accordance with the contract but in fact it was not. The State showed a complete disregard for the language used and bases its order not upon any unforeseen condition making the work as originally planned impossible but simply upon ignoring the clear import of its own language. Its action can only be termed arbitrary, capricious and unreasonable.
The claimants knew that they bid with certain risks involved that they might not be able to drive piles for the estimated costs and with the possibility that subsurface conditions might have rendered driving to the minimum lengths designated impossible. One of the risks that they were not required to run under the contract was that they would be prevented from driving minimum lengths of piles by an arbitrary order of the State in violation of the contract. They had a right to rely upon the representations contained in the “ Special Bridge Notes ” with the risk limited to errors in their own estimates or to unforeseen physical conditions. Under the circumstances here the court finds that the action of the State in preventing the claimants from driving at least 16,735 linear feet of Cast-in-Place concrete piles constituted a breach of the contract.
There remains for determination the question of damages and there is here involved the problem of the so-called recorded piles. When the contractor was prepared to drive piles the State marked the first pile off in six-inch lengths and then recorded the blows per minute and the blows necessary to drive *791 the pile. This information was then forwarded to Albany and subsequently orders were given as to the lengths to be driven. After driving the first pile claimants were instructed to prepare to jet and these instructions were later countermanded and claimants were told that they could not utilize jetting under any circumstances. The so-called recorded piles were actually a part of the foundation structure but claimants contend that the driving of recorded piles entailed delay since it was necessary to drive one pile and then wait until a determination had been obtained from Albany as to the length to which the other piles should be driven.
There is admittedly no provision for such recorded piles in the contract. The State contends that the use of recorded piles is a well-recognized practice followed on every pile-driving job for the State and since the recorded piles constitute a part of the structure, payment is included in Item 85C.
Claimants arrive at the amount of damage by contending that the costs of driving a pile a linear foot at the rate anticipated and to be reasonably expected was $3.27. The unit price was $6 per linear foot and for the 5,642 feet which claimants were prevented from driving this amounts to a loss of anticipated profit in the amount of $15,402.66.
The actual cost of driving 11,093 feet of piles was computed to be $49,660.59 or $4.476 per linear foot. This however, included 190 feet of recorded or test piles, the cost of which was computed separately by claimants at $3,405.17 so that once the length of the piles was actually determined by order of the State based upon the results of the recorded piles the cost of driving was $4.242 per foot. Claimants assert that the actual cost should have been $3.27 a foot and the increased cost resulted from the State’s breach of contract. They also assert that the breach of contract which made the length of piles uncertain, required cutting oft of excess length in some cases and splicing in others, resulting in delay and 1,093 linear feet of unusable Cast-in-Place piles purchased for the job at a cost of $2,230.03.
The determination of the amount of damage on this record is made difficult by the claimants’ failure to comply with the provisions of the contract. Claimants assert that the driving of recorded piles and the order restricting the length of piles to less than the mínimums in the contract were not contract work and violated provisions of the contract. Under these circumstances it was the claimants’ duty under the contract to promptly notify the Superintendent of Public Works of claimants’ contentions and claimants and the engineer were then *792 required to keep daily records of all labor, material and equipment involved in the disputed work.
This claimants failed to do. The daily records maintained by the engineer actually appear to be moré complete and accurate than any records maintained by the claimants.
Under the contract the claimants were also required upon completion and final acceptance and the submission of the final estimate to submit a written verified statement of all claims and if for delay, to set forth the cause of each delay and the period or periods of time when the claimants were delayed. This the claimants failed to do.
Claimants have failed to establish that they are entitled to recover for any amount of unusable Cast-in-Place piles. It is not shown that this loss was the result of any breach by the State. Even had the State permitted the driving to the designated minimum lengths in the contract, there would necessarily have been some splicing of piles required and unusable piles resulting from cutting off. By claimants own evidence, piles in the exact dimensions of the minimum designated lengths in the contract were not available. Claimants actually purchased piles of 17-foot and 30-foot lengths and 20-foot extensions. Claimants, therefore, have not proved that the breach by the State resulted in damage in the amount of $2,230.03 for cost of piles made unusable.
Claimants assert that there were delays in driving the piles as a result of the State’s breach of contract. They assert that much of this delay resulted from the driving of recorded piles and that additional delay resulted from refusal to permit jetting or other methods of driving. The record however, does not establish any material delay in driving resulting from the State’s breach. Neither the State nor the contractor could know with any degree of certainty as to whether or not jetting would be required, how difficult the driving would be or whether or not required resistance would be met at the minimum designated length. Following the driving of the first recorded pile it could not be examined because of water therein and this was not a delay resulting from the State’s breach. It appears that the necessity of obtaining a designation of length from Albany should have been within the contemplation of the claimants at the time of entering into the contract and there does not appear to have been any undue delay resulting from that method of operation. Any delays which occurred are not attributed to any breach by the State.
Having established the length to which the piles were to be driven, the claimants proceeded with the driving and subse *793 quent delays were almost entirely attributable to claimants’ own actions or conditions over which neither the claimants nor the State had any control. The court therefore finds that the claimants have failed to establish that the cost of driving the 11,093 linear feet actually utilized in the structure was materially increased by the State’s breach of contract. It is not shown that had the State permitted jetting this driving could have been done in any less period of time or at any less cost nor is it shown that the additional 5,642 linear feet which claimants were prevented from driving could have been driven at a less unit cost than involved in the piles actually driven. Claimants in fact estimated a driving rate of 400 to 450 linear feet per day in bidding on this contract. In 40 days on which driving occurred the rate of 400 linear feet per day was actually exceeded on 15 days. On 11 days the rate of driving of less than 400 feet per day was clearly attributable either to the claimants’ choice or to conditions over which neither claimants nor the State had any control.
The failure of the claimants to keep good, accurate and complete records must bear heavily against them since the contract itself provided for a procedure to be followed by the claimants in dealing with disputed work. The court finds that the best measure of the costs of driving is the price which it actually cost the claimants to drive 10,903 linear feet, which excludes the cost of driving recorded piles as separately computed by the claimants. This cost was $4.242 per linear foot so that the reasonably to be anticipated profit lost by reason of the State’s breach of contract in preventing the claimants from driving 5,642 linear feet was $1.758 per linear foot. The court finds that claimants suffered damage by reason of the State’s breach of contract in preventing the driving of 5,642 linear feet of piles in the total amount of $9,918.64.
This leaves for determination the question of interest. Under the contract a final payment does not become due until all work has been completed, all claims presented and all accounts for extra work and material rendered and a final estimate prepared. The contract clearly contemplates some lapse of time between the acceptance of the work and the completion of the final estimate. In some cases the State may take an unreasonable length of time to do this but in the absence of an allegation and proof by the claimants that the time between acceptance of work and submission of the final estimate is unreasonable, it must be assumed that the time within which the final estimate is submitted marks the expiration of a reasonable time and thereby establishes the date on which interest commences to run.
*794 Here there is no allegation or proof that there was an unreasonable time between acceptance of the work and submission of the final estimate although more than eight months elapsed. In this period it appears that certain correspondence and conversations took place concerning claimants’ right to additional compensation.
The court finds that the claimants are entitled to judgment in the amount of $9,918.64, with interest from January 16, 1953 to the date of entry of judgment. Also claimants are entitled to a judgment for interest on the sum of $27,601.44 from January 16, 1953 to July 3, 1953 and to a judgment for interest on the sum of $12,938.95 from July 3, 1953 to August 22, 1953.
This constitutes the written decision of the court in accordance with the provisions of section 440 of the Civil Practice Act and judgment may be entered in accordance herewith.