John P. Gualtieri, J.
This is a claim for damages for breach of contract arising out of a highway construction contract executed by the State of New York and the claimant on May 11, 1956.
The claim alleges that the State made false and misleading representations to the claimant upon which it relied and that as a result thereof the claimant has been damaged in the sum of $343,803.42.
At the trial the following were claimed to be the items of damage: (a) $84,948 as a result of the amount of “borrow” misrepresented in the contract plans; (b) $121,192.38 (erroneously computed by claimant as $121,182.38) for increased transportation costs resulting from the misrepresentation; (c) $55,250.34 in connection with the misrepresentation of the amount of .sod to be removed in the performance of the contract; and (d) $78,247.42, damages sustained by reason of the unavailability of railroad facilities of the New York, Ontario and Western Railroad contemplated as existing when the contract was made.
Under a separate judgment of the court dated December 14, 1959, the claimant was awarded the sum of $94,097.29, the amount admitted to be due under the State’s final estimate, the matter of interest on this amount having been reserved for determination in the trial of the present action.
The contract involved the construction of a highway in Sullivan County known as Contract No. PARC 56-87, Monticello-Liberty Part II. Invitation for bids was first published about March 10, 1956. The claimant received the proposal about March 26, 1956; the bids were opened on April 19, 1956.
*147 In the contract plans which were merged in and became part of the contract, the State represented that the contractor would require approximately 419,725 cubic yards of “borrow” material, to be obtained by the contractor from sources outside the construction site. In the execution of the contract the claimant discovered that this approximate figure of 419,725 cubic yards turned out to be only 65,775 cubic yards. In other words, the State’s approximation was wrong by over 600%.
Also, it is contended that the State represented that there would be sod removal required to the extent of 130,238 cubic yards; it actually turned out to be 21,904 cubic yards.
It is contended by the claimant that after receiving the proposal and in preparing its bid it relied upon these representations. If the State’s representations had been reasonably accurate it projected a profit on the “ borrow ” item of $84,948 and a profit on the sod removal item of $55,250.34. With this anticipated profit leeway on these two items under section 2B it put in a bid of 68^ per cubic yard for all work performed under this section 2B of the contract labeled “ Unclassified Excavation ” made up of several component items.
We shall consider the “ borrow ” item first because the court has concluded to reach a definite result in connection with this item in the claim and the claim for the sod removal item requires separate discussion and consideration.
Here it is important to bear in mind that this was not a lump-sum contract; we have a contract in which the bidder was obliged to put in prices for each of the items broken down in the proposal.
The distinction, of course, is that if this had been a lump-sum contract any erroneous approximation of quantities on the part of the State would not result in liability. It has been held consistently that in such a contract the bidder takes his own chances. (Dunbar & Sullivan Dredging Co. v. State of New York, 259 App. Div. 440; Lentilhon v. City of New York, 102 App. Div. 548.)
We are called upon to consider therefore whether the gross discrepancy between the State’s projected figures and the actual amount subsequently found to be the fact imposes an obligation upon the State to respond in damages.
Although there are allegations in the claim that the State was guilty of fraud, no proof of fraudulent intent was offered during the trial. The court concludes, however, that proof of a fraudulent scheme is not required under the facts presented here to establish the State’s liability. A party to a contract, be it a governmental unit or an individual, cannot make reckless inaccu *148 rate representations to induce another to sign a contract and thereafter escape the consequences of such statements to the financial detriment of the other party. (Lowman Constr. Co. v. State of New York, 10 N. Y. S. 2d 963.)
The representations were contained in the plans and became part of the contract between the parties. This is not a ease of a bidder relying upon preliminary estimates forming no part of the final agreement.
It is apparent from the evidence before the court that the State had for at least a year or two prior to releasing the proposal engaged in studies and investigations on the site for the purpose of discovering the physical facts upon which to inform prospective bidders as to the various quantities and items which the bidders were to consider in preparing their bids. The State allowed the bidders approximately three weeks within which to prepare and submit their bids, an obviously insufficient period of time for a bidder to personally check the quantities and items recited in the proposal. A bidder has a right to rely upon the fact that the State had made its own studies reasonably accurate and that when the plans said approximately 419,725 cubic yards of “borrow” it would not turn out to be 65,775 cubic yards.
Where a bidder is allowed insufficient time within which to make a personal study, the State cannot invoke the general exculpatory clauses to exonerate itself from liability. Particularly is this true in a case such as this where no specific warning is given in connection with the particular item the representation of which is in question; or in a situation like that in the case at bar where the bidder has not time to make a personal and detailed inspection. (Young Fehlhaber Pile Co. v. State of New York, 265 App. Div. 61.)
The State knew that no prospective bidder could in the space of time alloted discover the inaccuracy of its representations as to quantities when it itself had a long period of time in which to carefully and scientifically discover the true facts.
It is remarkable that the State offered no reasonable explanation for the great disparity between its represented quantities and the actual amounts later found to be required.
It is urged by the State that the items under section 2B - unclassified materials, is made up of several components and that by considering the total of the items in that category, the difference between the represented quantities of the total items in that classification would not be as great if considered altogether. The fallacy of the State’s position is that the radical disparity between the quantities projected and the quantities *149 actually found to be true are confined to the two items involved, namely, “borrow” material and sod removal. It would be understandable if a reasonable variation were spread throughout all the items in the section 2B classification. This serious discrepancy would throw the computations of any bidder off kilter.
Unless a party to a contract such as this is held to a reasonable adherence to representations made in a contract, it would be far better to omit projected amounts altogether and inform the bidder that he must engage in a guessing game of his own rather than give him presumably carefully made guideposts which turn out in effect to be an entrapment. Justice requires that such a result cannot be tolerated and that the State because of its reckless representations, though not fraudulent, must respond in damages.
The State cannot be heard to urge that if the actual figures exceeded the amount estimated and the claimant made a substantial unexpected profit that the State would have no recourse. The answer is simple. It is within the State’s power to make proper investigations and careful surveys before a contract is let out for bid, thus avoiding unfair consequences either way; either that the contractor will profit by reason of the State’s miscalculations or that the contractor will suffer substantial loss by reason of its carelessness.
It is this court’s holding that the claimant is entitled to an award in connection with this ‘1 borrow ’ ’ item in the sum of $84,948. In making this determination we wish to make it abundantly clear that the decision is limited to the facts of this case. A reasonable variation between projected quantities and actual quantities would not impose liability upon the State. Bidders know that such quantities cannot be scientifically accurate. Here we have a different situation. The difference between the represented quantities and the actual quantities is so great that the State cannot escape the consequences of its misleading and deceptive statements to the financial detriment of an innocent bidder, without at least offering some plausible explanation for what we find to be recklessly inaccurate representations.
We reach a different conclusion with reference to that part of the claim respecting the sod removal item. As has been pointed out, the quantity of estimated “ borrow ” material required for the job is expressly and unequivocally contained in the contract plans which are incorporated in the final contract between the parties. The projected quantities of sod removal are not as clearly defined in the plans or contract. Although the major quantities of this item are mentioned in the plans, the claimant *150 itself admitted that in order to ascertain the actual amount of sod removal involved it went to the detail sheets in the office of the Department of Public Works which, of course, were not part of the plans subsequently incorporated in the contract. The court finds in connection with this sod removal item, therefore, that the representations as to quantities were not completely incorporated in the contract; that the claimant relied upon its own investigation of preliminary projections and that the State is not liable for such information as the claimant obtained from this source. (Foundation Co. v. State of New York, 233 N. Y. 177; Rocell Constr. Co. v. State of New York, 208 Misc. 364.)
There is one additional reason for denying the claimant relief for this item. We have held the State liable in connection with the “ borrow ” item because of the obvious impossibility of any prospective bidder making his own investigations of subsurface conditions in the short period allowed between the invitation to bid and the dates when the bids were to be submitted. This reasoning does not apply to sod removal which is obviously a surface situation capable of inspection and observation by the bidder. No explanation was offered or attempted by the claimant as to why it could not have relied upon its own investigations in connection with this item as provided by the provisions of the contract.
It is the court’s conclusion that this part of the claim based upon the sod removal must be disallowed.
There is much difference of opinion between the parties as to the amount of damages sustained by the claimant for overhaul, increased transportation cost. Because of the vast difference in the “borrow” item, claimant was subjected to tremendous additional transportation costs in the removal of material from one part of the job to the other which it could not have possibly anticipated. The State contends that if any overhaul damages are allowed that they should be computed under Item 6 of the contract which provides in substance that only such overhaul as exceeds 2,000 feet from a given point shall be paid by the State.
The claimant contends that if the State has breached its contract the overhaul item of damage should be a sequence of the damages recoverable for breach of contract and not be compelled to lose additional money by having to measure its damages under Item 6.
We adopt the claimant’s view. This overhaul item of damage was not an ordinary incident in connection with the normal *151 performance of the contract which Item 6 of the contract provides for. It was overhaul caused by the State’s breach of contract and the damages to be allowed to the claimant should be damages as part of the breach and not a contractual assessment of compensation as prescribed in Item 6.
The total amount of damage established by the claimant for this overhaul item is in the sum of $153,253.05. Oddly enough, in the final estimate, the State made an allowance of $32,060.67 for overhaul. It is difficult to understand how the State arrived at this overhaul figure of $32,060.67 because mathematical computations indicate that even if the claimant were to be paid under Item 6 the amount would be substantially in excess of the amount allowed by the State in its final estimate. Nevertheless, the claimant has received this sum and it is to be deducted from the total damages for overhaul of $153,253.05 and the award herein will be in the sum of $121,192.38 for this element of damage.
There is one final item of damage litigated between the parties at the trial. The contract provided in substance that there were available, for delivery of materials to the job, railroad facilities via New York, Ontario and Western Railroad at Liberty, New York, 0.8 miles from a station at the site of the contract. It is undisputed that at the time the representation was made and at the time the contract was signed on May 11, 1956, such railroad facilities were available. In fact they continued to be available until March 29, 1957, when the railroad discontinued operations by order of the United States District Court. During the time that the contractor was working on the job it received a communication from the railroad, Exhibit 24, produced by the claimant itself, assuring everyone concerned that rumors to the effect that the New York, Ontario and Western Railroad would discontinue operations were unfounded and they would “ definitely continue normal operations ”.
Because of the unavailability of railroad facilities at the time they were intended to be used by the claimant, it claims that it was compelled to use other more expensive methods of hauling the material to the job and it suffered damage for this reason in the sum of $78,247.42.
We hold that the State is not liable for this item of damage. The State was guilty of no fraud or misstatement. The railroad facilities were available when the contract was signed and continued to be available for approximately one year thereafter. The discontinuance of these facilities, through no fault of the State, and the consequent increased cost of transportation of *152 materials to the claimant is a risk which this claimant or any contractor has to take. The State is no more liable here than it would have been had it stated and represented what the current costs of railroad or any other means of hauling materials were. Railroad hauling prices could have substantially increased between the time of the execution of the contract and the performance of the work for which, of course, the State would not be liable.
There was no impossibility of performance by reason of the railroad’s discontinuance of operations as claimed by the claimant. Other facilities were available to enable the contractor to perform its contract as demonstrated by the fact that the materials were actually brought to the job without the railroad facilities, at substantially increased cost perhaps, but for these extra costs the claimant cannot hold the State liable. (American Stores Equip. & Constr. Corp. v. Buffalo Municipal Housing Auth., 202 Misc. 222, affd. 282 App. Div. 824, affd. 306 N. Y. 773.)
There remains the matter of interest to be paid by the State on the amounts herein awarded and on the $94,097.29 paid to the claimant by the State as directed by the severance judgment of this court dated December 14, 1959.
Final acceptance of the completion of the contract was given by the State on October 9, 1958. The claimant urges that three months is an adequate period of time from the date of acceptance within which to make payment of its obligation. The State argues that because in former contracts between this claimant and the State as much as a year had elapsed before payment was tendered that the claimant should be compelled to adhere to this previous practice and experience. We cannot follow this reasoning. A contractor is entitled to payment either upon acceptance of the contract or within a reasonable period thereafter. The State offered no evidence to support its contention that a year in this case should be allowed regardless of what may have been the situation in connection with other contracts between the State and any contractor.
The claimant has consented that in this case a period of three months from the date of acceptance be allowed and the court feels that this is a reasonable concession on its part and interest on the State’s obligation will be computed from January 9, 1959, three months after the acceptance date. (D’Angelo v. State of New York, 7 Misc 2d 783; Rusciano & Son Corp. v. State of New York, 201 Misc. 690, affd. 281 App. Div. 733.)
Under the determinations which the court has reached, the court makes an award to the claimant as follows: (a) $84,948 in connection with the “ borrow ” item; (b) $121,192.38 for *153 overhaul, making a total award of $206,140.38, with interest on said amount of $206,140.38 from January 9, 1959 to the date of entry of judgment herein and interest on $94,097.29 from January 9, 1959 to December 14, 1959, the date of the severance judgment of this court.