John P. Gualtieri, P. J.
This is a claim for damages for breach of contract arising out of a contract for the construction of a portion of the New York State Thruway, Erie Section, Subdivision E-6A, imown as Contract E. T. 56-7, S. T. 56-6, ft. 'C. 56-5. The contract was executed by the Thruway Authority and the claimant on or about March 21, "1956.
The claimant contends that the Thruway Authority made misrepresentations in the contract plans upon which the claimant *765 relied and, as a result thereof, it has been damaged in the sum of $231,518.06. The claimant asks for judgment in this amount plus various items of interest.
The following were claimed to be the items of damage: (a) $228,614.92 as a result of the amount of “borrow ” and “ waste ” misrepresented in the contract plans; (b) $774.87 as a result of the use of darex in the cement; (c) $2,128.27 for engineering and inspection charges improperly assessed against the claimant.
Under a separate judgment of the court entered in the office of the Clerk of the Court of Claims on September 16, 1959, the claimant was awarded the sum of $150,808.11, the amount concededly due under the Thruway’s final estimate. The matter of interest on this amount was reserved for determination in the trial of the present action.
The claimant now seeks interest at 4% ($6,484.74) on the severance judgment from September 23, 1958, the date the contract was accepted as complete, to October 20, 1959, date of payment of the severance judgment. The claimant also asks for interest on that $6,484.74 from October 20, 1959 to the date of judgment herein; and interest on items (a), (b) and (c) above from September 23, 1958 to the date of judgment herein.
The invitation for bids was first advertised on February 1, 1956 and came to the attention of the claimant during the first week of February at which time the claimant was performing another Thruway contract adjacent on the east to this contract. The claimant submitted its bid within the time allowed on February 23, 1956.
The main claim involves the amount of “borrow” and “ waste ” it was necessary for the contractor to handle in performing the contract and the expense of such handling. The plans prepared by the Thruway called for 92,795 cubic yards of “ borrow ”. The evidence submitted at trial by the claimant, which was not contested by the Thruway, showed that 237,394 cubic yards of “borrow” were actually used, 155% of the Thruway’s figure. Under the heading ‘ ‘ waste ” the plans called for the contractor to waste 30,974 cubic yards. In order to complete the contract 157,732 cubic yards of material wore wasted, an increase of 409%.
The claimant bid 62 cents a cubic yard on the “ borrow ” and 50 cents a cubic yard on the “ waste ” and all other items making up Item 2B.S, “ Unclassified Excavation ”. The claimant’s evidence, uncontested by the Thruway, showed the cost plus overhead and profit of the “ .borrow ” operations as $241,653.32. The Thruway paid the claimant at a rate of 62 cents per cubic yard for 92,795 cubic yards, the planned amount, and at 50 cents *766 per cubic yard for the excess 144,599 cubic yards; a total of $129,832.40. 'The claimed damage for “ borrow ” is therefore $111,820.9:2.
In the wasting operations the claimant’s evidence showed that cost plus profit and overhead amounted to $195,660. The claimant was paid at the rate of 50 cents a cuibic yard for all of the 157,732 cubic yards of “waste”, a total of $78,866. The claimed damage for “ waste ” is therefore $116,794. The Thruway therefore paid something for each cubic yard of material moved. The claimant alleges that this is insufficient because the soil conditions, the amounts and ratio of materials encountered was substantially different than what was represented in the plans and upon which the contractor computed his bid.
The court must determine if the discrepancies in soil conditions and amounts of material along with the Thruway’s action in preparing the plans and the contractor’s interpretation of the plans give rise to a situation wherein the Thruway must respond in damages for the increased soil handling.
The Thruway took over one and one-half years to prepare the plans for this portion of the Thruway. After the advertisement for bids the contractors who wished to bid had only three weeks to prepare their bids. The claimant in this case prepared its bid by studying the plans compiled by the Thruway and other data in the Thruway’s Buffalo office and by having its resident engineer make an on the spot investigation of the site. There was insufficient time for any subsurface exploration by the claimant and therefore its interpretation of subsurface conditions had to be based primarily on the figures and plans furnished by the Thruway.
The Thruway in effect planned the job for the contractor. Its figures were not estimates but definite representations of the amounts of various materials to be found within the area of the contract. The elaborate and definite plans broke the area down into balances and set forth exact amounts of “waste” and “ borrow ” to be found within each balance.
The main trouble developed in Balances 3, 5, 7 and 11. The plans had indicated “waste” of 12,326 cubic yards could be expected within these four balances; actually the contractor was forced to waste 139,083 cubic yards. The soil turned out to be very moist and because of that condition much of it was unsuitable for the subsurface of the Thruway.
The independent consulting engineering firm hired by the Thruway described the situation as follows: “soil on this contract has presented exceptional problems.”
*767 Although the evidence at the trial did not produce a completely satisfactory definition of “ waste ”, the court finds that the claimant’s figures on 1 ‘ waste ” are correct and this material was not suitable for the purposes represented by the plans. The contractor had to bring in from outside the contract area increased amounts of “borrow ” in order to supply enough suitable material for the Thruway. In order to obtain this “ borrow ” the claimant had to open three borrow pits on the land of private individuals near the Thruway and pay for the material removed to the Thruway.
The result was that the contractor encountered a situation it could not reasonably have expected from the Thruway plans. Due to the short time allowed to develop its bid, the completeness and definiteness of the Thruway’s figures and the superior knowledge of this area by the Thruway, the court finds that the contractor was justified in relying on the affirmative representations as to the quantities of “ borrow ” and “waste” of the State and when those representations turned out to be as inaccurate as the evidence at the trial showed, the Thruway must bear the damage that resulted from its gross misrepresentations on these two items.
This court finds the factual situation similar to that involved in the case of Dolomite Prods. Co. v. State of New York (258 App. Div. 294, 295) where the court said “ In doing the work Page was required to carry away and waste certain excavated earth, and to ‘ borrow ’ and bring in extra filling, because the excavated earth was not fit for filling, though the contract provided that it might be so used ”.
Claimant had a right to rely on the Thruway’s contract that the excavated earth could be used as fill. It would be inequitable for the Thruway to compel the contractor to do extra work and not pay for it.
The Thruway relies on the general exculpatory clause in the contract. The cases have long held that this clause will not bar a claim where gross misrepresentations are made and there was no adequate opportunity for the contractor to make an independent study. In effect, exculpatory clauses are rejected because the contractor has no alternative but to rely on the State’s figures. (Atlanta Constr. Co. v. State of New York, 103 Mise. 233.)
Much of the Thruway’s brief deals with a discussion of Weston v. State of New York (262 N. Y. 46) as a precedent for dismissing the claim. The Weston case can be distinguished because (1) in that case the quantities were not spelled out in the plans but were only preliminary estimates; (2) there was no separation of *768 quantities for the various items in the Weston case; (3) the instructions to bidders were substantially different. In the 30 years since the Weston case the courts of the State have limited the decision and granted awards in situations where the quality and quantities of material encountered were substantially different than the State planners had envisioned.
The court finds that the notes on pages 6, 7, 31 and 32 of the plans which the Thruway claims indicate the unsatisfactory soil conditions of the area, are not sufficiently definite or explicit for that purpose. 'They are vague and even to an experienced contractor would not throw doubt on the quantities of ‘ ‘ borrow ’ ’ and “waste” in the Table of Balances and Earth Work Summary or the type of soil conditions to be encountered.
The court was impressed by the fact that the Thruway did not give the contractor its detailed soil survey of the area which took a year to prepare nor did the Thruway indicate that such a survey existed. While the Thruway does not have a duty to make every single item of information available, a contractor should at least be informed of the existence of such information when the Thruway allows only three weeks to prepare a bid for a $2,000,000 contract. Furthermore, testimony of certain Thruway employees indicates that there was knowledge of the unsuitable condition which was not sufficiently revealed to the contractor in the plans or otherwise.
We find that claimant was not negligent in preparing its bid. The site inspection by the claimant’s engineer and the examination of the plans prepared by the Thruway were all that could reasonably be expected in the three weeks between advertisement and bid.
The court has been bothered by seeming discrepancy in the figures which cannot be resolved by the testimony, the exhibits or the briefs. The claimant’s figures.which were not contested by the State show an overrun of 144,599' cubic yards for ‘ ‘ borrow ” and 126,758 for “ waste ” or a total of 271,357 cubic yards more than the plans indicated. Yet for the whole contract the plans indicated a neat quantity of 676,355 cubic yards for all the 2BS items and this is rounded to a figure of 754,000. The final figure for all 2BlS items submitted by the Thruway and not contested by the claimant and the figure used as the final figure on the supplemental agreement was 841,797 cubic yards. This is an overrun of only 77,979' on the rounded figure or an increase of a little over 11%. The court can only assume that other 2BS items other than “ borrow ” and “waste” were reduced and therefore while the total overrun was only 77,979 the “ borrow ” and “ waste ” overrun total was 271,357.
*769 The Thruway did not challenge the amount of excess “borrow” and “waste” or the cost of handling this material. Instead it maintained that no damages were due because the discrepancies were reasonable or should have been anticipated. The court finds that the difference between the amounts set forth in the plans and the final quantities was unreasonable, that the plans did not reflect the difficulty to be encountered due to soil conditions, and the claimant is therefore entitled to damages.
In the preparation of this contract there has been a material misrepresentation by the Thruway which was reasonably relied upon by the contractor and resulted in damage to the contractor. The quantities of “ borrow ” and “waste” were grossly understated and the exceptionally difficult soil problems encountered on the job site due to the wetness and blue clay were also inaccurately misrepresented. 'Since the Thruway took over a year in preparing the plans and the contractor had only three weeks the contractor reasonably relied on the Thruway’s figures. In fact the Thruway must have intended that the contractor rely. These serious discrepancies would throw the computations of any bidder off kilter. (John Arborio, Inc. v. State of New York, 41 Misc 2d 145.)
There being no seriously contradictory evidence on the amount of damages, the court accepts the claimant’s figure and awards $116,794 on the claim for “ waste ” and $111,820.92 on the claim for “ borrow ”.
The court dismisses the claimant’s demand for the extra cost of substituting darex for daragg puzzolan. The absence of daragg in the Buffalo area was in no way the result of any action of the Thruway Authority nor did the Authority in any way represent that daragg would be available in the Buffalo area. The risk of supply in that area being eliminated is upon the party who agreed to supply the material. This failure of supply did not make the contract impossible of performance. Other supplies at greater distance could have been located. Instead the claimant found it more expedient to substitute a slightly more expensive substance found in the area which the Thruway agreed to accept but at no extra cost. (Bond v. Stewart, 58 App. Div. 615; American Store Equip. & Constr. Corp. v. Buffalo Municipal Housing Auth., 202 Misc. 222; John H. Reetz, Inc. v. Stackler, 24 Misc 2d 291.)
The third item of damage is a claim for $2,128.27 for engineering and inspection assessed against the claimant for those services rendered after December 1, 1957. The original completion date was June 1, 1957. However, the Thruway Authority granted extensions without charges up to December 1, 1957, *770 because it felt that the delays in completion were not the fault of the contractor. Later the Thruway granted extensions with charges until July 30, 1958.
Strikes, bad weather and difficulty in handling the soil due to its high moisture content were the reasons for the delay in completion. The court finds that further extensions should have been granted especially in view of the extremely difficult soil conditions and the additional amounts of material that had to be handled. This item was improperly assessed and therefore should be restored to the contractor. (Good Roads Eng. & Contr. Co. v. State of New York, 176 Misc. 1012; Garofano Constr. Co. v. State of New York, 183 Misc. 1080.)
The claimant seeks three different items of interest in regard to the controversy involving this contract. First, there is interest on the severance judgment from the date of acceptance of the contract, September 23, 1958, until the payment of the severance judgment on October 20, 1959. The court holds that the claimant cannot and, as testimony of its witnesses showed, did not expect payment on the date of acceptance. Six months is a reasonable time to await payment in this ease and therefore the claimant is awarded interest from March 23,1959 to October 20, 1959 on $150,808.11, the amount of the severance judgment. The court computes this sum to be $3,468.59.
Second, since the court finds that this sum should have been paid on October 20, 1959, and since this amount is a liquidated sum the claimant is awarded interest on this $3,468.59 from October 20, 1959.
Third, the claimant is also to be awarded interest both on the claim for “waste” and “borrow”, a sum of $228,614.92 and on the claim for engineering and inspection charges, a sum of $2,128.27 from March 23, 1959, a date six months from the acceptance of the contract.
The court therefore makes an award to the claimant as follows: (a) $228,614.92 with interest from March 23, 1959; (b) $2,128.27 with interest from March 23, 1959 and (c) $3,468.59 with interest from October 20, 1959.